**UNITED STATES of America, Plaintiff,**

v.

**$9,041,598.68 (NINE MILLION FORTY ONE THOUSAND, FIVE HUNDRED NINETY EIGHT DOLLARS AND SIXTY EIGHT CENTS), Defendant.**

**Civil Action No. H–95–3182.**

United States District Court,
S.D. Texas,
Houston Division.

April 25, 1997.

Robert J. Clary, Jamie King Harrison, Owens, Clary & Aiken, Dallas, TX, for Shore Exploration and Production Corp.

Jay Scott Carothers, Exxon Corp., Houston, TX, for Exxon Corp.

William T. Hankinson, Jane Politz Brandt, Anna E. Marple, Thompson & Knight, Dallas, TX, Jeffrey K. Smith, Texaco Inc., New Orleans, LA, Michael Warren Perrin, King & Spaulding, Houston, TX, for Texaco, Inc.

Scott Charles Krist, Krist, Gunn, Weller, Neumann & Morrison, Houston, TX, Stanley Jack Krist, Michael Theodore Trefny, Stanley J. Krist and Associates, Houston, TX, Joel Howard Muscat, Law Office of Joel Muscat, Stafford, TX, for Eastern Exploration, Inc.

Maxel B. 'Bud' Silverberg, Law Office of Maxel B. 'Bud' Silverberg, Dallas, TX, pro se.

Douglas Stewart Lang, Gardere & Wynne, Dallas, TX, for Julie Challenger, Inc.

### *MEMORANDUM AND ORDER*

ATLAS, District Judge.

This civil forfeiture case was tried to a jury during the week of March 10, 1997. The jury returned a verdict on March 15, 1997. The parties now have filed motions for judgment. *See* **Government's Motion for Judgment** [Doc. # 202]; **Claimant's Motion for Judgment** [Doc. # 204]; **Claimant's Motion for Entry of Judgment as Matter of Law** [Doc. # 205].

For the reasons stated herein, the Government's Motion for Judgment is granted, and Claimant's motions are denied. The Defendant currency will be forfeited to the Government in its entirety.

This opinion also addresses several other issues not fully addressed or not resolved at trial.

## I. *MOTIONS FOR JUDGMENT*

On a motion for judgment as a matter of law, a jury verdict "must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find' as the jury did." *Hiltgen v. Sumrall,* 47 F.3d 695, 699–700 (5th Cir.1995) (quoting Fed.R.Civ.P. 50(a)(1)). Under longstanding Fifth Circuit standards,

'the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable jurors could not arrive at a contrary verdict, then granting a motion for judgment as a matter of law is proper.'

*Seven-Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1387 (5th Cir.1996) (quoting *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), *overruled on other grounds, Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir.1997) (en banc)). The motion should be denied if there is "substantial evidence" opposed to the motions, that is, " 'evidence of such quality and weight that reasonable and fair-minded men [or women] in the exercise of impartial judgment might reach different conclusions.' " *Miller v. Butcher Distributors,* 89 F.3d 265, 268 (5th Cir.1996) (quoting *Boeing,* 411 F.2d at 374). " '[I]t is the function of the jury as the traditional finder of facts, and not the court, to weigh conflicting evidence and inferences and to determine the credibility of witnesses.' " *Id.* (quoting *Boeing,* 411 F.2d at 375).

The jury was asked the special interrogatories and answered as follows:

### *QUESTION NO. 1*

Do you find from a preponderance of the evidence that the Defendant $9,041,598.68, in whole or in part, was *not* the proceeds of and was *not* used to facilitate drug trafficking activity?

Answer "yes" or "no": <u>No</u>

**Proceed to Question No. 2.**

### *QUESTION NO. 2*

Do you find from a preponderance of the evidence that the Defendant $9,041,598.68, in whole or in part, was *not* involved in a financial transaction that was conducted or

attempted to be conducted with the intent to promote the carrying on of drug trafficking activity?

Answer "yes" or "no": _No_

**Proceed to Question No. 3.**

*QUESTION NO. 3*

Do you find by a preponderance of the evidence that the Defendant $9,041,598.68, in whole or in part, was *not* transported or transferred from a place inside the United States to or through a place outside the United States with the intent to promote drug trafficking activity?

Answer "yes" or "no": _Yes_

**Proceed to Question No. 4.**

*QUESTION NO. 4*

Do you find by a preponderance of the evidence that any one or more of the deposits to the account at Texas Commerce Bank is/are *not* a monetary transaction in criminally derived property of a value greater than $10,000.00 in United States currency derived from drug trafficking activity?

Answer "yes" or "no": _No_

**Proceed to Question No. 5.**

**If you have answered "yes" to any of the above questions, then answer Question No. 5. If you have answered "no" to all of the above questions, then do not answer Question No. 5.**

*QUESTION NO. 5*

To the extent, and only to the extent, you have found in answer to the foregoing questions that all or part of the Defendant $9,041,598.68, if any, was:

- money used to facilitate drug trafficking activities or the proceeds of drug trafficking activities;

- a financial transaction that was conducted or attempted to be conducted with the intent to promote the carrying on of drug trafficking activity;

- money transported or transferred from a place inside the United States to or

through a place outside the United States with the intent to promote drug trafficking activity; and/or,

- monetary transaction(s) in criminally derived property of a value greater than $10,000.00 in United States currency derived from drug trafficking activity,

what amount of the Defendant $9,041,-598.68, if any, do you find from a preponderance of the evidence was from a source *other than* the above sources?

Answer in dollars and cents: _$1,100,000.00_

Verdict Form [Doc. # 195].

By answering "yes" to Questions No. 1, 2 and 4, the jury stated that all of the Defendant currency came from drug-related sources. The verdict, however, could be construed to award Claimant $1,100,000.00, based on the jury's findings in answer to Questions No. 3 and 5.

Claimant argues that judgment should be entered permitting him to recover $1,100,-000.00, and that any other result impermissibly ignores the jury's response to Question No. 5. Claimant urges that the jury's response to Question No. 5 is supported by the testimony of Dr. Ruiz Quintanilla that he received § 1,100,000.00 in cash from the sale of real estate in Mexico and gave the funds to his son, José Francisco Ruiz Massieu, to care for. Dr. Ruiz Quintanilla further explained that years later, after he gave permission, José Francisco transferred the money to Claimant.[1] Claimant takes the position that Questions Nos. 1 through 4 were confusing, while Question No. 5 was clear, and that no basis exists to disregard the jury's response to Question No. 5. Claimant asks the Court to disregard the jury's answers to Questions No. 1, 2 and 4.

Claimant timely objected to the double negatives in the jury interrogatories, arguing that they would confuse the jury, and requested that the jury be asked only two questions.[2] The Court denied Claimant's re-

---

**1.** Claimant also testified to these matters.

**2.** Claimant requested the following interrogatories:

*Requested July Issue No. 1*

Do you find from a preponderance of the evidence that all or part of the $9,041,598.68 from Account No. 80100355370 were from a source other than the following:

quested charge because Claimant's expressed theory at trial was that the Government had failed to meet its burden on its four legal theories for forfeiture. Claimant disavowed any intent to rely on the "innocent owner" defense or any other statutorily mandated defense theory. *See* 18 U.S.C. § 981(a)(2); 21 U.S.C. § 881(a)(6).

■ The Fifth Circuit has held that, once the Government makes its showing of probable cause to believe that a substantial connection exists between the property sought to be forfeited and the illegal activity, the burden shifts to the claimant to demonstrate by a preponderance of the evidence "that factual predicates for forfeiture have not been met *or* that a defense to the forfeiture applies." *United States v. 1988 Oldsmobile Supreme,* 983 F.2d 670, 674 (5th Cir.1993) (footnotes omitted) (emphasis added) (citing *United States v. $364,960.00 in United States Currency,* 661 F.2d 319, 325 (5th Cir.1981); *United States v. Little Al,* 712 F.2d 133, 137 (5th Cir.1983)); *United States v. Land, Property Recorded in Name of Neff,* 960 F.2d 561, 563 (5th Cir.1992). *See* Court's Memorandum and Order Regarding Bifurcation [Doc. # 172]. It thus appears that a claimant may prevail if he convinces the jury the Government has not proven its own theories of the case; a claimant need not necessarily establish an affirmative defense to forfeiture in

[Identify specific statutory elements of statutory basis on which Court find [sic] probable cause, if any].
Answer "Yes" or "No."
ANSWER: _____

***Requested Jury Issue No. 2***
What amount of the $9,041,598.68, if any, do you find from a preponderance of the evidence were from a source other than the following:
[Identify specific statutory elements of statutory basis on which Court find [sic] probable cause, if any].
Answer in dollar [sic] and cents.
ANSWER: $_____
Claimant's Supplemental Requested Jury Issues [Doc. # 198].

3. The Government requested and the Court delivered the jury questions based on the relevant statutes: 21 U.S.C. § 881(a)(6) (Question No. 1); 18 U.S.C. § 981(a)(1)(A) with 18 U.S.C. § 1956(a)(1)(A) (Question No. 2); 18 U.S.C. § 981(a)(1)(A) with 18 U.S.C. § 1956(a)(2)(A) (Question No. 3); and 18 U.S.C. § 981(a)(1)(A) with 18 U.S.C. § 1957(a) (Question No. 4).

order to prevail at trial. The Court therefore posed to the jury one question for each of the Government's theories, rather than Claimant's one proposed interrogatory, in order to determine whether or not Claimant had met his burden of proof on any or all of the Government's theories[3] The final jury question was to allow the jury to determine the amount of Claimant's recovery, if any. This question was predicated on a favorable finding for Claimant on one or more of the Government's theories.

Civil forfeiture law generally, and jury instructions in civil forfeiture cases in particular, are not well developed.[4] In an exercise of caution, the Court adopted language from the Fifth Circuit case law on which Claimant's strategy seemed to rest, which defines the Claimant's burden as proof of a negative. *See 1988 Oldsmobile Supreme,* 983 F.2d at 674 (claimant must prove that factual predicates for forfeiture have *not* been met); *Neff,* 960 F.2d at 563 (claimant has burden to establish by a preponderance of the evidence that the property was *not* used for illegal activity). As a courtesy to the parties, and in recognition that the jury interrogatories could be confusing, the Court supplied the parties with a copy of the "Court's Instructions to the Jury" and the Verdict Form prior to counsel's closing arguments. Both

4. There is no guidance from the Fifth Circuit (or any other appellate court) as to how to instruct a jury, or to frame the jury interrogatories, given the shifting burden of proof in the forfeiture statutes. Although Claimant carries the burden of proof once the Government has made a probable cause showing, it is awkward in a jury trial for Claimant to be required to prove a negative, *i.e.,* that the Defendant currency had no involvement in specified unlawful activities. Since Claimant did not pursue an innocent ownership defense, but rather attacked the Government's proof under each of its theories, *see 1988 Oldsmobile Supreme,* 983 F.2d at 674, the Court framed the issues in the jury's interrogatories to reflect the elements in the forfeiture and drug statutes identified in the Government's complaint. It is unclear whether, particularly in cases in which a recognized statutory defense is *not* asserted by a claimant, the jury interrogatories should reflect the claimant's non-statutory argument as set forth in its claim, or whether the questions should track the Government's complaint, which sets forth specific legal theories under the applicable statutes.

the Government and Claimant argued directly from the Verdict Form during their closing arguments, telling the jury whether they desired a "yes" or "no" response to each question.

The Court agrees with Claimant that the jury's response to Question No. 5 may not be disregarded. *Hiltgen,* 47 F.3d at 699–700. Nevertheless, in order to give proper effect to all of the jury's responses, the response to Question No. 5 must be read in conjunction with the other responses and with the predicate instruction. The predicate instruction to Question No. 5 stated that the jury was not to answer Question No. 5 unless it had answered "yes" to any of the previous questions. Therefore, the jury's answer to Question No. 5 must be read as an explanation of its answer to Question No. 3—the only question to which the jury had answered "yes." Specifically, the response to Question No. 5 indicates that Claimant proved to the jury's satisfaction that $1,100,000.00 was not money "transported or transferred from a place inside the United States to or through a place outside the United States with the intent to promote drug trafficking activity," as referenced in Question No. 3.

The superficial inconsistency of the jury's answers to Questions No. 3 and 5 with the responses to Questions No. 1, 2 and 4 is reconciled if the answers to Questions No. 3 and 5 are interpreted to mean that the jury was persuaded by Claimant that the Government's proof was insufficient as to the movement of $1,100,000.00 of the Defendant currency *from the United States* to or through Mexico, as asked in Question No. 3. Question No. 3 is the only jury question that contained

a geographic element, namely, a requirement of proof that the funds were transported from somewhere inside the United States to Mexico, in addition to an element relating to drug trafficking. The testimony offered by Claimant and his witnesses as to the $1,100,-000.00 transferred by Dr. Ruiz Quintanilla to his son likely explains the jury's answer to Question No. 5, since the evidence supports a jury finding that the relationship of the $1,100,000.00 to the United States had not been demonstrated adequately. However, the response to Question No. 3 does not indicate that the jury believed that the $1,100,000.00 was not drug-related.

In context, the answer of $1,100,000.00 to Question No. 5 is academic. Even though Claimant convinced the jury that the $1,100,-000.00 was not the result of the activity identified in Question No. 3, Claimant failed to prove that the $1,100,000.00 was not the result of the activity identified in Questions No. 1, 2 and 4. Stated another way, through its responses to Questions No. 1, 2 and 4 the jury stated *three times* that *all* of the Defendant currency was drug-related.[5] Since the jury found that the Claimant failed to prove that the Defendant currency did not come from the drug-related sources identified in Questions No. 1, 2 and 4,[6] Claimant failed to overcome the Government's forfeiture proof as to any the funds under the theories forming the basis for those questions.

In sum, the United States claimed the right to forfeit the Defendant currency under four separate theories. Claimant's approach to the case was to attack the Government's proof as to each of these theories. The

---

**5.** Both Questions No. I and 2 asked the jury whether the Defendant currency, "in whole *or in part,*" was *not* involved in drug trafficking activity. Therefore, if the jury had believed that $1,100,000.00 was wholly unrelated to drug activity, rather than only that it was not shown to have moved from the United States to Mexico as asked in Question No. 3, it could and should have answered "yes" to both Question No. I and Question No. 2. Indeed, this is the response Claimant's counsel advocated during closing arguments. Moreover, Question No. 4 asked whether *"any one or more* of the deposits" to the Houston bank account were monetary transactions in criminally derived property. Again, if the jury had believed that $1,100,000.00 was family money with no connection to drug activi-

ty, it could and should have answered "yes" to this question. The jury's answer to Question No. 5 then would have resulted in Claimant's recovery of the $1,100,000.00. The jury's "no" responses to all of these questions clearly indicate that it considered all of the Defendant currency and therefore all of the bank deposits to have been the product of drug trafficking activity.

**6.** The Court notes that the sources identified in Questions No. 1, 2 and 4 are not mutually exclusive, and thus there is no inconsistency in a statement from the jury that the Defendant currency, in its entirety, came from each of the specified sources.

Court must read the verdict as the jury's decision that the Government prevailed on three of its four theories. Because Claimant failed to defeat the Government's proof on three theories, and this Court found the requisite probable cause existed, the Government is entitled to forfeit the Defendant currency in its entirety. In this way, the Court gives effect to all of the jury's responses. Since a "legally sufficient evidentiary basis" exists for a reasonable jury to find as this jury did, the verdict is upheld, Fed.R.Civ.P. 50(a)(1); *Hiltgen*, 47 F.3d at 699–700, and judgment will be entered in favor of the United States as to the entire amount of the Defendant currency.[7]

## II. OTHER UNRESOLVED LEGAL ISSUES

### A. Sufficiency of Claimant's Ownership or Possessory Interest, as Related to Standing

 This Court held early in the litigation of this action, based upon the relevant authorities and the record as it existed at the time, that Claimant had standing to contest the forfeiture of the Defendant currency. The Court's opinions explicitly recognized the light burden placed upon Claimant at the preliminary stage of the case,[8] and expressed doubt as to what legally cognizable "ownership" or "possessory" interest Claimant had.[9] The Court did not require Claimant to define his interest according to Texas law, such as gift, bailment, or trust, since appellate courts have not required a claimant to satisfy such a detailed or stringent burden of proof at the early stages of litigation.[10]

However, because of ambiguities in the procedures courts have set forth for forfeiture cases, Claimant's standing to recover some or all of the Defendant currency to date has not been definitively resolved. Although the issue now may be rendered moot by the foregoing judgment on the verdict, to be entered as a matter of law, Claimant has repeatedly declared his intention to appeal. If Claimant is successful in his challenge to certain of this Court's rulings, the legal sufficiency of Claimant's interest in the Defendant currency, *i.e.,* his standing to contest the forfeiture, would become a live issue once again.

The Court therefore deems it necessary and appropriate for the sake of judicial economy to determine whether Claimant has a recognized legal or equitable interest in all or part of the Defendant currency, which interest would entitle him to recover the currency if he were to prevail as a result of the jury verdict. Standing is " 'literally a threshold question for entry into federal court.' " *$38,-570*, 950 F.2d at 1111 (quoting *United States v. $321,470 in U.S. Currency*, 874 F.2d 298, 302 (5th Cir.1989)). Since standing limits the court's exercise of its jurisdiction, "the court must consider the standing of any party even

---

7. Interest on the forfeited funds is addressed *infra* at 653.

8. *See* Memorandum and Order Regarding Standing, dated March 31, 1996 [Doc. # 54]; Memorandum and Order on Reconsideration of Standing, dated May 22, 1996 [Doc. # 75]. In order to establish standing, Claimant merely was required to demonstrate a "facially colorable" interest in the proceedings, and was not required to prove the merits of his underlying claim. *U.S. v. $38,-570 in U.S. Currency*, 950 F.2d 1108, 1112 (5th Cir.1992). Indeed, while a "bare assertion of ownership" of the currency, without more, is insufficient to confer standing, "some evidence" of an ownership interest is sufficient. *Id.* at 1112–13. One district court has stated that the demand "that claimants show a legitimate source for the purpose of establishing standing improperly accelerates the claimant's ultimate burden," since it is proper that the government "first demonstrate probable clause sufficient to shift the burden to the claimant." *U.S. v. $80,-*

760.00 in U.S. Currency, 781 F.Supp. 462, 467 n. 15 (N.D.Tex.1991) (internal quotations and citations omitted), *aff'd*, 978 F.2d 709 (5th Cir.1992). As this Court noted earlier in this case, courts generally look to dominion and control, such as possession, title, financial stake, as evidence of an ownership interest. *$38,570*, 950 F.2d at 1113.

9. The Court characterized Claimant's demonstrated interest as "unusual" and, after having recited the definition of bailment, stated, "Although some facts of this case seem to reflect a classic bailment relationship, rather than outright ownership, the standing inquiry is necessarily superficial and Massieu has met his initial burden." Memorandum and Order on Reconsideration of Standing [Doc. # 75], at 4–5.

10. Nevertheless, the Court fails to understand why, at the standing stage in this case, Claimant could not have provided affidavits from his family members to support his theory of ownership.

if the issue has not been raised by the parties to the action." *United States v. One 18th Century Colombian Monstrance,* 797 F.2d 1370, 1374 (5th Cir.1986), *opinion on denial of rehearing,* 802 F.2d 837 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987). The issue of standing is one of law. *$38,570,* 950 F.2d at 1111.[11]

The Court recognizes that it is unorthodox to address the threshold issue of standing after having upheld a jury's verdict. However, Claimant had satisfied the low burden of proof for standing that Fifth Circuit authority requires this Court to impose pretrial. It was only during trial, after the Government satisfied its probable cause burden and the burden of proof shifted to Claimant, that Claimant could be held to the more demanding standard of a preponderance of the evidence.

■ Claimant has argued consistently at all stages of this case that he has standing by virtue of ownership by gift. The Court finds and concludes on the basis of the entire record that, since summary judgment was granted in favor of the Government on the issue of gift and Claimant never articulated any other recognizable property interest in the Defendant currency, Claimant lacks standing to contest the forfeiture and to recover any portion of the currency.[12]

Shortly prior to trial, the Government moved for summary judgment, arguing that the facts of record did not support "ownership by gift," which appeared to be the only legal basis for Claimant's interest in the Defendant currency. The Court granted summary judgment in favor of the Government, holding that Claimant had failed to establish a genuine question of fact that he could meet the test for ownership by gift as to the Defendant currency. *See* Memorandum and Order Granting Partial Summary Judgment [Doc. # 117]; Memorandum and Order Denying Reconsideration [Doc. # 170]. These opinions dealt narrowly with the elements of gift; the rulings did not decide the broader and more general issue of defining precisely Claimant's ownership or interest in the Defendant property, because the issues were not fully addressed by the parties.

Immediately prior to trial, Claimant explicitly abandoned any bailment theory. *See* Claimant's Memorandum on Classification of Mario Ruiz Massieu's Interest in Funds [Doc. # 180]. At trial, Claimant did not develop the ownership issue, apparently because he chose not to pursue an "innocent owner" defense. Claimant did not argue or supply legal authority for any specific interest in property recognized under Texas law. Instead, he adhered to his argument that he was entitled to the Defendant currency because he had possession of it for his own use and on behalf of his family, and since he had placed the funds in a bank account over which he had exclusive control. The Court notes that no formal claim by Claimant's family is on file.

■ Despite Claimant's efforts at trial to defeat the forfeiture by establishing alternative sources and explanations for the Defendant currency, Claimant's evidence at trial supported and reinforced the Court's summary judgment opinion. The Court again concludes, as a matter of law, that Claimant failed to demonstrate a genuine issue of material fact that the Defendant currency was comprised of "gifts" to Claimant under Texas law. To the extent necessary, the Court further holds that Claimant failed at trial to prove ownership by gift, or any other recognizable property interest, by a preponderance of the evidence.

As found by the jury in its answers to the special interrogatories, Claimant failed at tri-

---

**11.** Neither party explicitly addressed at trial Claimant's specific ownership interest *or* the standing issue. However, the Government's summary judgment motion and its earlier motions to dismiss Claimant's claim for lack of standing properly preserved the issue. *See* Docs. # 5, 56, 107.

**12.** Even if Claimant had been permitted to present his proof on this issue of ownership by gift at trial, such proof would be identical to the evidence actually introduced by Claimant at trial. Indeed, Claimant acknowledged such at conferences during trial, outside of the jury's presence, when the Court raised the possibility of allowing Claimant to present evidence going to ownership by gift despite the fact that the Government had prevailed on the issue on summary judgment.

al to prove that the Defendant currency is not drug related. In addition, the weight of Claimant's *own* evidence at trial does not support Claimant's "gift" theory; rather, it establishes nothing more than that, in the eyes of Claimant and his father, the Defendant currency was "family money." Claimant's father, Dr. Ruiz Quintanilla, testified that the family had accumulated money which was in the custody of José Francisco Ruiz Massieu, but that José Francisco had, in 1994, asked for his father's authority and consent to transfer to money to Claimant, and that Dr. Ruiz Quintanilla had consented. Dr. Ruiz Quintanilla also testified that the money was accumulated by the entire family so as to prepare for the possibility that the family would have to leave Mexico, and that Claimant had a moral responsibility to use the money to help his family members. Similarly, Claimant testified that his brother José Francisco Ruiz Massieu originally had taken custody of the "family fund" because he had been a person who had helped all other members of the family and was the most sophisticated in financial matters. Claimant further testified regarding family conversations as to the amount of money each member could or did contribute to the fund, and echoed his father's testimony that the fund had been created to prepare for the possibility that the entire family would need to relocate.[13]

The testimony of Dr. Ruiz Quintanilla and Claimant that José Francisco Ruiz Massieu and later Claimant had "complete authority" over the money indicates to the Court merely that José Francisco Ruiz Massieu, and then Claimant, had day-to-day control over the funds.

While the outer limits of standing under the forfeiture statutes still await appellate court definition, the broad "ownership" interest defined in the federal case law as any person with a "recognizable legal or equitable interest in the property seized," must be interpreted in light of state law delineating legally recognized ownership or possessory interests. *See* Memorandum and Order Granting Partial Summary Judgment [Doc. # 117], at 8–9 & nn. 3–4 (discussing interplay between federal and state standards); *$38,-570*, 950 F.2d at 1111–12 & n. 4; *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 805 n. 8 (3d Cir.1994). *See also United States v. Lot 9, Block 2 of Donnybrook Place*, 919 F.2d 994, 1000 (5th Cir.1990) (regarding innocent owner defense, "interest should be established by referring to Texas law, and the court should protect that interest to the extent that Texas law does not contravene the federal forfeiture scheme").[14]

It is Claimant's burden to demonstrate his claim to the Defendant currency satisfies this standard. *$38,570*, 950 F.2d at 1111. The Court, in accordance with the relevant authority on standing, did not require detailed proof and pleading as to Claimant's standing prior to trial. *See id.* at 1112 (a claimant need not prove the merit of his underlying claim to establish standing, but must show a facially colorable interest); *U.S. v. $80,760.00 in U.S. Currency*, 781 F.Supp. 462, 467 n. 15 (N.D.Tex.1991), *aff'd*, 978 F.2d 709 (5th Cir. 1992) (claimant's ultimate burden would be improperly accelerated if court were to demand, before the government makes its probable cause showing sufficient to shift burden to claimant, that claimant show a legitimate source of currency for the purpose

---

13. Claimant introduced some evidence that an unspecified sum (which he estimated to have been hundreds of thousands of dollars) of the Defendant currency were "bonuses" to him that he saved from his tenures as ambassador to Denmark or as a Deputy Attorney General in Mexico. Claimant, however, provided no probative documentary evidence for his receipt of such large sums or for the dates of such payments. The Court finds that Claimant's evidence is unsubstantiated and not credible. Even if Claimant's evidence were deemed sufficient to create genuine question of fact, the evidence is over-

whelmingly outweighed by contrary evidence in the record indicating the funds were payments to facilitate drug trafficking or proceeds of payments involving such activities.

14. Both sides argued in the initial round of summary judgment briefing that Texas law applied. *See* Docs. # 107, 109. Claimant's briefing on his motion for reconsideration asserted that Mexican law applied, *see* Doc. # 126, but no competent expert opinion evidence was introduced at trial on this matter.

of establishing standing).[15] Now that this case has been tried, however, and the Government has made its probable cause showing and Claimant has had the opportunity to present all of his evidence to a jury, the considerations afforded to claimants at early stages of forfeiture litigation are neither necessary nor justified.

All the credible evidence of record requires the conclusion that Claimant did not receive an unconditional transfer of the funds, as is required for ownership by gift under Texas law. Claimant never articulated any other recognizable property interest in the Defendant currency. Since Claimant has failed to establish a particular "recognizable legal or equitable interest" under state or federal law, *see supra* at 650, he has failed to demonstrate that he has standing to recover any of Defendant currency.[16]

### B. *Probable Cause.*

■ Claimant has moved for entry of judgment as a matter of law on the basis that the Government failed to establish the existence of probable cause as of June 15, 1995, and therefore that the *seizure* of Defendant's currency on March 13, 1995, was improper. *See* Claimant's Motion for Entry of Judgment as a Matter of Law [Doc. # 205]. As noted in a previous opinion, Memorandum and Order [Doc. # 184], at 2 & n. 1, justification of probable cause for seizure of the defendant property in an *in rem* proceeding must be distinguished from justification of probable cause for forfeiture. At least one

leading commentator has noted that lack of probable cause for seizure only results in suppression of evidence, and has "no other bearing on the probable cause question under [19 U.S.C.] section 1615." 1 David B. Smith, Prosecution and Defense of Forfeiture Cases, ¶ 11.03[6], at 11–28 n. 51 (1996) (citing *United States v. Monkey,* 725 F.2d 1007, 1011–12 (5th Cir.1984)).

In *United States v. Monkey,* the Fifth Circuit held that evidence obtained in an unlawful seizure is inadmissible. Since the Government in the case at bar did not seek to use evidence obtained from the seizure, namely, the Defendant currency itself, it was unnecessary for the Court to resolve the issue of the validity of the seizure *per se.*[17] Claimant's motion for judgment is denied.

Moreover, to the extent that Claimant is requesting judgment as a matter of law that the Government did not have probable cause for the *forfeiture* as of June 15, 1995, the motion also is denied. The Court's basis for finding probable cause as of June 15, 1995 was delivered in detail on the record in open court on March 15, 1997.

### C. *Admissibility of Co–Conspirator Statements*

The Court held during the course of the trial that various statements by the Government's witnesses are admissible as co-conspirators' statements, pursuant to Federal

---

15. Moreover, during the pretrial stages of this case Claimant was responding to repeated extradition proceedings. He complained that documents were unavailable to him since he was not given access to his home in Mexico. Claimant further complained that discovery of the Government's witnesses and documents was precluded for security reasons and on the grounds that a pending investigation was underway. However, these excuses are no longer probative. Claimant's sources of proof of ownership are largely his family and other third party records, which evidence was presented shortly before or during trial. In addition, Claimant repeatedly sought a prompt trial date, thus indicating that he was prepared to prove his claim despite certain logistical difficulties.

16. *See United States v. $511,780.00 in United States Currency,* 847 F.Supp. 908 (M.D.Ala.1994)

(deciding standing issue at conclusion of bench trial). *Cf. United States v. One 6.5 Mm. Mannlicher–Carcano Military Rifle,* 406 F.2d 1170, 1172 (5th Cir.1969) (stating in *dicta* that "an adjudication of ownership would be in order where the property was to be returned to the claimant").

17. There is a further open issue: when and how should a seizure for forfeiture be challenged? Claimant filed an action at the time of the seizure and was pursuing an appeal of the district court's granting the pre-suit order of seizure. When the Government commenced this forfeiture case, Claimant abandoned his appeal. Although Claimant initially raised the seizure issue, the issue became moot when the Government did not rely upon any of the seized evidence for its probable cause showing. *Cf. Monkey,* 725 F.2d at 1012.

Rule of Evidence 801(d)(2)(E).[18] The Court made findings on several occasions at the sidebar when Claimant lodged objections to the testimony. For the sake of completeness and to summarize the Court's reasoning in one place, the Court makes the following findings and conclusions.

■■■■ For a statement to be admissible as a co-conspirator statement, the Court must find that:

1. there was a conspiracy in existence;
2. the declarant was a member of that conspiracy;
3. the defendant against whom the statement is offered was a member of that conspiracy;
4. the statement was made in furtherance of that conspiracy; and
5. the statement was made during the course of that conspiracy.

*United States v. Asibor*, 109 F.3d 1023, 1032–33 (5th Cir.1997); *United States v. Broussard*, 80 F.3d 1025, 1038 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 264, 136 L.Ed.2d 189 (1996); *United States v. Jensen*, 41 F.3d 946, 960 (5th Cir.1994), *cert. denied*, 514 U.S. 1101, 115 S.Ct. 1835, 131 L.Ed.2d 754 (1995); *United States v. Ruiz*, 987 F.2d 243, 247 (5th Cir.), *cert. denied*, 510 U.S. 855, 114 S.Ct. 163, 126 L.Ed.2d 123 (1993). The Court may take into consideration the content of an alleged co-conspirator's statement itself in determining whether that statement is to be admitted as a co-conspirator statement. *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987); *Broussard*, 80 F.3d at 1039. The Court must make a determination as to whether the Government has proven by a preponderance of the evidence the elements listed above. *Broussard*, 80 F.3d at 1038.

■■■■ To use the co-conspirator exception to the hearsay rule, there does not need to be an indictment charging a conspiracy. *United States v. Layton*, 855 F.2d 1388, 1398 (9th Cir.1988), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989); *United States v. Kendall*, 665 F.2d 126, 131

& n. 6 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). The statement must have been made by a member of the conspiracy at the time of the statement, but the declarant need not be a named defendant in the indictment, *Asibor*, 109 F.3d at 1032–33, or, presumably, in the pleading asserting the existence of the conspiracy.

■■■■ The Claimant primarily objected to testimony by three Government witnesses: Tony Ortiz, who was a self-described cocaine trafficker within the Juan Garcia Abrego narcotics cartel, and Raul Macias and Cesar Dominguez Becerra, who were former actual or "pseudo" officers in the Mexican law enforcement hierarchy. The potentially objectionable statements consisted of Ortiz's, Macias' and Dominguez's repetition of various comments by others concerning the source and destination of cargo the witnesses stated was cocaine or cash that had resulted from the sale of cocaine. Claimant contended that these statements were hearsay and thus not admissible.

The Court found at trial and again finds that these statements were admissible under the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). The Government established by a preponderance of the credible evidence all of the elements necessary to the admissibility of the contested statements:

1. *A Conspiracy Existed.*—The Court finds that Government proved by a preponderance of the credible evidence that during the period starting no later than 1990 through at least 1994, a conspiracy existed to distribute and to sell cocaine and marijuana in the United States by transporting the narcotics through Mexico and receiving payment for the sales in Mexico. Co-conspirators included certain officials within the PGR, including but not limited to Claimant Massieu, his subordinates (including Stergios and Adrian Carrera Fuentes), Roberto Loyo (who allegedly carried money to Claimant Massieu), various other named and unnamed

---

**18.** "A statement is not hearsay if ... [t]he statement is offered against a party and is . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" Fed.R.Evid. 801(d)(2)(E).

officials working within the Mexican Federal Judicial Police (MFJP) with authority for investigating violations of and enforcing Mexico's narcotics laws, and other individuals with local law enforcement responsibilities. Co-conspirators also included various narcotics traffickers, including Juan Garcia Abrego, Adriano Felix, Amado Carrillo Fuentes, and individuals who worked for them. While the identities of many of the co-conspirators was not established by the Government, unrebutted testimony at trial established that numerous officials, from the local police up through the highest ranks of the MFJP, including the Deputy Attorney General, received payments of cash in exchange for allowing the traffickers to transport narcotics during specified periods. The evidence established that the narcotics traffickers used cash obtained from the sale of narcotics in the United States to pay these officials.[19]

**2. Declarant Was a Member of the Conspiracy.**—The Court finds that each Ortiz, Dominguez and Macias were members of the conspiracy alleged and proven by the Government.

**3. Person Against Whom the Statements Are Offered Was a Member of the Conspiracy.**—The Court finds further that, during the times that Claimant Massieu served in the position as Deputy Attorney General or in comparable positions, he was a member of the conspiracy. The fact that Claimant did not occupy the office of Deputy Attorney General during 1990–92 and parts of 1993 and 1994 does not change the Court's conclusions as to admissibility of the witnesses' testimony. Once a person joins a conspiracy, evidence about the conspiracy prior to the person's joining the conspiracy is admissible against that person. *United States v. Barksdale–Contreras,* 972 F.2d 111, 114 (5th Cir.1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1060, 122 L.Ed.2d 366 (1993). Moreover, there is no evidence that Claimant ever withdrew from the conspiracy.

**4. The Statements Were Made in Furtherance of and During the Course of the Conspiracy.**—Each of the statements admitted into evidence were made in furtherance and in the course of a wide-ranging conspiracy, described above, in that they pertained to movement of drugs through Mexico and associated bribery of Mexican officials for the purpose of inducing those officials not to prosecute or enforce Mexican anti-drug laws against the drug cartel's couriers and traffickers.

The Court therefore concludes that the Government established that the statements included in the testimony of Ortiz, Dominguez and Macias, as well as in the affidavit of Carrera Fuentes—*i.e.,* statements about payments by narcotics traffickers, transportation of cocaine and marijuana through Mexico to the United States, the transportation of cash from the United States into Mexico, and the willingness of the MFJP officials (as well as local officials and their henchmen) to permit, participate in, or at least not prosecute such activities—meet the co-conspirator exception to hearsay in Rule 801(d)(2)(E), and therefore were admissible in evidence at trial.

### D. Interest and Costs

The Government is entitled to recover the interest on the Defendant currency, if any, since it is property or proceeds "traceable" to the drug trafficking activity found by the jury. *See* 18 U.S.C. § 981(a)(1)(A); 21 U.S.C. § 881(a)(6). All right, title and interest in the property vested in the United States upon commission of the act giving rise to the forfeiture. 18 U.S.C. § 981(f); 21 U.S.C. § 881(h). *See Monkey,* 725 F.2d at 1012.

As for costs, Rule 54(d) provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."[20] Fed.

---

**19.** The Court relies for these findings upon the testimony by witnesses including Ortiz, Dominguez and Macias, as well as that of United States Customs Service Robert Rutt and the affidavit of Adrian Carrera Fuentes, a former Mexican MFJP official. In addition the testimony of United States Customs Inspectors and supervisors, Scott Menger, Debra Zezima, and Vincent Iglio, corroborated this result. The small denominations of the bills comprising the $9 million deposited at Texas Commerce Bank at the direction of Claimant also corroborates this conclusion.

**20.** Rule 54(d) does not apply to cases in which an express provision for costs is "made either in

R.Civ.P. 54(d); *Corpus Christi Oil and Gas v. Zapata Gulf Marine*, 71 F.3d 198, 205 n. 5 (5th Cir.1995). This provision "creates 'a strong presumption that the prevailing party will be awarded costs.'" *U.S. v. D.K.G. Appaloosas, Inc.*, 829 F.2d 532, 539 (5th Cir. 1987), *cert. denied,* 485 U.S. 976, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988) (quoting *Schwarz v. Folloder,* 767 F.2d 125, 131 (5th Cir.1985)). The Court has discretion to decline to award costs to a prevailing party, if the Court gives reasons for refusing to permit the award. *Id.; Schwarz,* 767 F.2d at 131.

 In this case, the Court exercises its discretion to deny costs to the Government. The Court anticipates that the majority of the Government's costs of court are attributable to the numerous expedited depositions which took place in the weeks immediately before trial.[21] Transcription of these depositions had to be expedited because of the Government's request, granted by the Court, that discovery of Government witnesses be stayed pending further related investigations by the Government and then completion of the Juan Garcia Abrego criminal trial. Claimant has consistently maintained that the stay was unnecessary. Moreover, it is likely that Claimant already has borne substantial cost as a result of the stay, since many of the expedited depositions, for which daily copy had to be ordered, were of the Government's confidential informants. Finally, as a result of the jury's verdict, Claimant, a person living outside his native country with no identified current source of income, will not recover any of the Defendant currency that he caused to be brought to the United States. Therefore, the Court deems it inappropriate and inequitable to require Claimant to pay court costs to the United States Government.

For the foregoing reasons, it is hereby

**ORDERED** that the **Government's Motion for Judgment** [Doc. # 202] is **GRANTED**. It is further

**ORDERED** that **Claimant's Motion for Judgment** [Doc. # 204] and **Claimant's Motion for Entry of Judgment as Matter of Law** [Doc. # 205] are **DENIED**. It is further

**ORDERED** that the Government is entitled to the interest, if any, on the Defendant currency. It is further

**ORDERED** that each party is to bear its own costs.

---

a statute of the United States or in these rules." Neither party has cited the Court to any other provision applicable to costs in this case. *Cf.* 28 U.S.C. § 2465 ("Upon the entry of judgment *for the claimant* in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs ...") (emphasis added).

**21.** No itemized bill of costs has been filed.